IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY ELLEN DALEY, et al.          :       CIVIL ACTION
                                  :
          v.                      :
                                  :
THE CITY OF PHILADELPHIA,         :
et al.                            :       NO. 05-4145

MEMORANDUM

Dalzell, J.                                    February 7, 2007

          This case arises from the mysterious death of a
fourteen-year-old girl who drowned in a pool the City of
Philadelphia operated.  The administratrix of the decedent's
estate and the decedent's mother sue the City of Philadelphia,
its Department of Recreation, and seven individuals.  They
advance state-created danger and failure-to-train claims under 42
U.S.C. § 1983, as well as claims under Pennsylvania's negligence
law, wrongful death act, and survival act.  Before us now is the
defendants' motion for summary judgment.

## I.  **Factual Background**

          Because, as will be seen, the state-created danger and
training jurisprudence are intensely fact-specific, we canvass
the record in detail.

### A.  The Events of July 5, 2003

          On July 5, 2003, fourteen-year-old Rashida Fancher
visited the Hunting Park Pool with her twelve-year-old sister
Tahirah, and her cousins, Christian and Marquan, then eight and
thirteen years old, respectively.  Compl. ¶ 24-25; T. Garrett
Dep. 4:21-22, Sept. 21, 2006;  Gray Dep. 3:16-17, Sept. 21, 2006;

Simmons Dep. 3:9-11, Sept. 21, 2006; A. Garrett Dep. 14:24-15:3, Sept. 21, 2006.  Rashida had taken swimming lessons at the Hunting Park Pool and knew how to swim.  T. Garrett Dep. 6:17-8:22.

The pool had opened a few days earlier for the summer season, and four lifeguards were on duty:  Marshall Johnson, II, Darrin Williams, Lamont Baldwin, and Quiana Wright.  Kerwawich Dep. 93:1-9, Sept. 13, 2006; Defs.' Prelim. Resp. to Pls.' Interr. ("Defs.' Prelim. Resp.") 11.a.  Johnson, a Lifeguard II, was responsible for supervising the three other lifeguards, each a Lifeguard I.  Johnson Dep. 41:21-42:6, Sept. 15, 2006; see also Defs.' Prelim. Resp. 11.a.

The facility supervisor that day was John Williams, also a lifeguard.  He decided how much of the pool to make available to swimmers.  J. Williams Dep. 78:10-16, Sept. 15, 2006.  The pool is fifty yards long and twenty-five yards wide. Id. at 109:13-15.  It is three feet deep on either end and five feet deep in the middle, with a gently graded slope from the deepest point of five feet to the shallower areas.  Id. at 70:16-20.  Because of safety considerations, John Williams decided that only half the pool needed to be open and that half would be cordoned off.  Id. at 68:21-76:11.[1]  He based his decision on the

---

[1] Others testified that the pool was roped off on July 5, 2003 because of its size.  See Wright Dep. 24:22-25:8, Oct. 25, 2006; Kerwawich Dep. 58:12-63:24.  Darrin Williams did not identify why the pool was roped off that day, but he did testify as to several reasons why the lifeguards customarily closed half of that pool.  D. Williams Dep. 48:2-49:8, 51:9-53:5, Sept. 13,
(continued...)

number of patrons and their ages, the number of lifeguards, and
the weather, as well as the condition of lifeguard chairs in the
closed section.  Id.  Recreation Department policy allowed up to
thirty patrons per lifeguard, regardless of what portion of a
pool was open for patrons.  Kerwawich Dep. 37:21-40:6.[2]  The
lifeguards' counter that day recorded ninety-three patrons at the
facility.  Id. at 105:12-106:17.

Before letting people into the water, the lifeguards
made all the patrons sit around the pool and then told them the
rules.  T. Garrett Dep. 10:20-11:22; D. Williams Dep. 75:21-
76:11; Wright Dep. 74:14-75:6.  After entering the pool, Tahirah,
Christian, and Marquan played games towards the middle of the
pool while Rashida stayed closer to the end.  T. Garrett Dep.

---

[1](...continued)
2006.  The primary reason was too few patrons to keep the whole
pool open, but sometimes it was because of an insufficient number
of lifeguards.  Id.  Also, people threw rocks and glass in the
closed-off pool area, which the lifeguards cleaned every morning
as well as they could.  Id.  Finally, people vandalized or stole
lifeguard chairs on the closed side of the pool.  Id.  On July 5,
2003, in the unused pool area, one lifeguard chair was missing
and another was lacking ladder steps.  Id. at 55:7-58:9.
        John Williams also testified that, during his tenure,
the lifeguards had never opened up the entire pool for the public
because there were not enough patrons and lifeguards.  J.
Williams Dep. 75:5-77:12.

[2] The Department of Recreation assigns lifeguards to
pools based on the size of the pool, but at all times each City
pool must have at least two lifeguards on duty.  Kerwawich Dep.
138:3-19, 139:1-2.  Because of lifeguards' days off, all
lifeguards staffed to a pool are rarely on duty at the same time.
Id. at 138:19-24.
        If the patron quota is reached, the lifeguards require
people to line up outside the pool gate and wait for someone to
leave before a new person can enter.  Id. at 40:7-41:20.  Thus,
pools without a full staff present operate by only allowing up to
thirty patrons per lifeguard on duty.  Id. at 139:3-140:1.

12:25-14:19; Simmons Dep. 10:20-12:5.  While playing in the pool, Tahirah saw a female lifeguard -- Wright, the only woman on duty -- sitting in her chair, and two other lifeguards talking by the gate.  T. Garrett Dep. 14:21-15:2, 34:7-17.

       At some point, Wright saw Rashida nearby on the pool deck and noticed that the girl's bathing suit strap was coming down, so she told Rashida to pick up the strap before jumping into the pool.  Wright Dep. 40:24-41:21, 46:13-20.  After Rashida jumped in, Wright resumed scanning the pool.  Id. at 41:18-42:12, 46:21-24.  Baldwin watched this interaction, and, after Rashida adjusted her suit, he saw her take a couple of steps in the pool.  Baldwin Dep. 49:12-51:10, Sept. 15, 2006.  Johnson also saw Rashida adjusting her bathing suit strap once she was in the water, about ten feet in front of Wright.  Johnson Dep. 58:12-59:20.

       When Tahirah thought the pool was becoming crowded, she realized she had not seen Rashida for some time, so she and her cousins began looking for her.  T. Garrett Dep. 15:6-16:15.  Tahirah spotted Rashida floating in the shallow water near Wright.  Id. at 16:13-16, 19:5-25.  Before finding her, the children had not noticed Rashida yelling, thrashing, or having swimming problems.  Id. at 26:21-27:5; Gray Dep. 21:17-23.  When the three children reached Rashida they thought she was playing or swimming, but after Tahirah touched her, Marquan suspected something was wrong.  T. Garrett Dep. 16:17-17:6; Gray Dep. 17:2-3, 18:3-18; Simmons Dep. 13:18-14:24.  One of the boys picked up

4

an unmoving Rashida, let her go to see what she would do, and picked her up again.  T. Garrett Dep. 17:6-11; Simmons Dep. 14:9-14.  The children did not yell for help, T. Garrett Dep. 26:5-6, but they testified that Wright then noticed them and jumped into the pool to help Rashida, T. Garrett Dep. 17:11-15, 20:2-7; Gray Dep. 18:21-23.  Tahirah estimates that two or three minutes elapsed between the time the children reached Rashida in the pool and when Wright reached them.  T. Garrett Dep. 25:24-26:20.

Wright testified that very shortly after telling Rashida to adjust her strap she saw a young boy patting Rashida on the head as the girl floated face-down with her body immediately under the water's surface.  Wright Dep. 52:2-54:11; see also Wright Dep. 13:17, Ex. 1 (Wright's diagram of pool indicating where she was and where Rashida was floating).  Wright immediately thought something was wrong, so she blew her whistle and, with assistance from another lifeguard and/or the children, got Rashida out of the water.[3]  Wright Dep. 54:12-55:6.

Immediately before this happened, Marshall Johnson was the designated "roamer" circling the pool area, and the lifeguards testified that the other three on duty were stationed in their chairs.  D. Williams Dep. 64:4-5, 65:23-66:23; Wright

_____

[3] Wright and Baldwin both testified that Baldwin helped Wright with Rashida, whom Wright said was heavier than she. Wright Dep. 57:22-23, 59:10-21; Baldwin Dep. 56:1-61:14.  Johnson also saw Baldwin bring Rashida to the pool's edge.  Johnson Dep. 62:19-22.  While the lifeguards did not testify as to the children's involvement after Wright reached Rashida, Marquan and Tahirah testified that they also helped get Rashida out.  Gray Dep. 20:9-12; T. Garrett Dep. 20:7-11.

Dep. 29:3-7, 40:19-23.  Baldwin estimated that fifty-five to
sixty-five people were scattered throughout the pool, and twenty-
five of those, mostly children, were in Rashida's general area,
but not very close to her.  Baldwin Dep. 44:10-19, 48:2-49:12.
Johnson testified he had asked a question of Baldwin, who was in
his chair, then looked across the pool and heard Wright blow her
whistle three times.  Johnson Dep. 60:24-61:22.  Baldwin
testified that when he heard Wright blow her whistle at about
1:15 p.m., Marshall was near his chair and they were not
interacting.  Baldwin Dep. 47:4-11, 56:9-24.  Darrin Williams
also heard Wright's three whistle blows.  D. Williams Dep. 63:18-
64:3.

        Upon hearing Wright's whistle, Johnson blew his whistle
once, cleared the pool with Darrin Williams, and then assisted
with Rashida.  Johnson Dep. 61:23-62:7.[4]  Darrin Williams also
called 911 as he was clearing the pool.  D. Williams Dep. 79:24-
81:1.  John Williams had been working in the pump house with loud
machinery for eight to twelve minutes before he heard three
whistle blows, and when he exited Rashida was already on the pool
deck.  J. Williams Dep. 87:21-89:1.[5]

---

        [4] While the lifeguards agree that Wright blew her
whistle, two of the children only recall a male lifeguard blowing
a whistle and telling everyone to get out of the pool.  See T.
Garrett Dep. 17:16-18:2; Gray Dep. 18:24-25, 19:24-20:3.  Since
all agree that at least one lifeguard promptly blew a whistle
once Wright detected a problem with Rashida, this difference is
immaterial.

        [5] He estimated that, before he went into the pump room,
eighty people were in the pool.  J. Williams Dep. 87:5-10.

Rashida was not breathing, and the lifeguards tried to resuscitate her until the paramedics arrived.  Wright Dep. 61:21-62:9, 62:19-63:11; Johnson Dep. 63:18-64:3, 69:1-71:21; Baldwin Dep. 62:8-63:4; D. Williams Dep. 81:7-87:21; T. Garrett Dep. 20:12-19.[6]  Johnson checked Rashida and felt a pulse but neither heard nor felt breathing, so he gave her a rescue breath.  Johnson Dep. 66:7-68:11.  John Williams then arrived, and, because he was the senior lifeguard present and a certified EMT paramedic, he took charge.  J. Williams Dep. 95:3-9.  When Johnson began mouth-to-mouth resuscitation, Rashida vomited.  Id. at 68:18-24.  To continue ventilating, John Williams testified that he put Rashida back in the water, "rotated her head, . . . splashed some water about the oral cavity, cleared the airway and ventilated again," at which time he determined her airway was unobstructed.  Id. at 95:16-96:3, 98:17-19.  The lifeguards then put Rashida back on the deck and administered CPR.  Id. at 98:20-99:2.[7]

---

[6] Tahirah thinks the ambulance got there in about five minutes, T. Garrett Dep. 21:19-23, Baldwin estimates seven to ten minutes, Baldwin Dep. 63:1-4, and Wright thinks it took twenty minutes, Wright Dep. 63:8-11,.

[7] There are some differences in the lifeguards' testimony about returning Rashida to the pool.  Johnson testified that John Williams put Rashida back in the pool to get some response, but got none.  Johnson Dep. 68:12-17.  Johnson did not specify whether the return to the pool was connected to the vomiting.  According to Darrin Williams, when Rashida vomited the lifeguards turned her on her side, and John Williams wiped the vomit off so it would not choke her.  D. Williams Dep. 85:17-86:1.  He did not address whether the lifeguards returned Rashida to the water.  Wright testified that when Rashida vomited the lifeguards got her close to the water to wash off the vomit, but
(continued...)

Shortly after the paramedics took Rashida to the
hospital, she died, and a doctor recorded the cause of death as
drowning.  <u>See</u> Defs.' Mot. Ex. O Report of Office of the Medical
Examiner. According to plaintiffs' medical expert's report,
issued without benefit of an autopsy, "The facts in this case and
the outcome provide for the conclusion that the time from onset
of submersion until effective CPR was administered was at least 4
1/2 to 5 minutes." Pls.' Resp. Ex. G Report of Dr. J. Modell at
unnumbered p.4, Nov. 21, 2006.[8]

> B.  <u>Lifeguard Training and Certification</u>

In July of 2003, the City had seventy-eight outdoor
pools and seven indoor pools, and all City pools were open to the
public free of charge.  Kerwawich Dep. 70:16-18; Kerwawich Decl.
¶ 3, Dec. 18, 2006.[9]   Each pool received two copies of the

---

[7](...continued)
did not put her back in the water.  Wright Dep. 62:5-18.
        We also note plaintiffs' expert's opinion that any time
spent putting Rashida back in the water could only have been
harmful because it interrupted CPR.  Pls.' Resp. to Defs.' Mot.
for Summ. J. ("Pls.' Resp.") Ex. G Letter of J. Modell, M.D.,
D.Sc., Nov. 29, 2006.

        [8] Another one of plaintiffs' expert reports concluded
that roping off half of the pool "created an unacceptable
crowding condition that directly resulted in the lifeguards'
failure to recognize that Rashida was submerged for more than at
least 4 1/2 to 5 minutes."  Pls.' Resp. Ex. P Case Report
Prepared by Francis A. Cosgrove, MA, CPT, at unnumbered p.5.

        [9] Terri Kerwawich was the City's Aquatics Coordinator
for the Recreation Department, and she coordinated all aspects of
the aquatics program, including supervising the water safety
instructors who conducted the lifeguard training classes.
Kerwawich Dep. 9:22-10:3, 16:14-19:14.  She reported to Program
Director Steve Malcurry, and he reported to Deputy Commissioner
                                                    (continued...)

City's 2003 Aquatic's Manual[10] -- one for the site supervisor and one for the pool staff, which includes the lifeguards.  Kerwawich Dep. 19:15-23:11, 52:2-53:7.  The lifeguards reviewed parts of the manual at orientation and were encouraged to read it and use it as a reference, but they were not required to read it.  Id. at 52:18-53:7.

The City of Philadelphia hires Water Safety Instructors (WSIs) to conduct its lifeguard training classes.  The American Red Cross certifies these WSIs as lifeguard instructors, and they teach classes for the City according to the guidelines of the American Red Cross.  Id. at 28:11-24.  In those training classes, lifeguards learn about patron surveillance, emergency preparation, rescue skills, first aid, and breathing and cardiac emergencies, and each lifeguard receives the American Red Cross Lifeguard Training Manual (the "Red Cross Manual").  Id. at 80:13-81:18; see also Pls.' Resp. Ex. I Red Cross Manual.  Each of the lifeguards on duty on July 5, 2003 testified to receiving instruction on scanning techniques during training classes.

_____

[9](...continued)
William Carapucci.  Id. at 26:5-22.

[10] The City produced the 2002 and 2004 Aquatics Manuals, but was unable to find the 2003 Aquatics Manual. However, Kerwawich's undisputed testimony is that the 2004 version is the same as the 2003 version.  See Kerwawich Dep. 46:4-48:21.  The Manual addressed many topics, including Lifeguard Assignments/Rotations, Scanning Techniques, How to Recognize a Distressed Swimmer, and Pool Emergency Action Plan. See Pls.' Resp. Ex. J Aquatics Manual 2004.

Johnson Dep. 31:6-15[11]; Wright Dep. 15:6-24, 22:19-24[12]; D.

Williams Dep. 14:5-15, 35:17-37:19[13]; Baldwin Dep. 25:3-26:8[14].

     The City requires its lifeguards to obtain

certifications for lifeguarding, CPR, and first aid, and all of

these certifications are part of the lifeguard training class.[15]

Kerwawich Dep. 95:5-20.  The lifeguard and first aid

certifications are valid for three years, and the CPR

certification is valid for one year if it is from the American

---

[11] Johnson also testified that he received reminders of scanning techniques during pre-season orientation and that he discussed scanning with other lifeguards at the Hunting Park Pool in the few days before Rashida drowned.  Johnson Dep. 31:6-33:23.

[12] Wright learned about patron surveillance techniques during her 2001 training.  Wright Dep. 30:11-24.  She testified that lifeguards at the Hunting Park Pool had reviewed zones of scanning responsibility, but that the topic was not stressed because the lifeguards there were experienced and knew which zones they were supposed to cover.  Id. at 31:5-32:21.  No one provided her with a patron surveillance diagram of the Hunting Park Pool.  Id. at 30:7-16. She also testified that on July 5, 2003 she scanned her zone of responsibility in the pool using a technique of overlapping zones with other lifeguards.  Id. at 41:22-46:12.

[13] Darrin Williams testified that, in addition to training on zones of responsibility during the certification classes, he also received instruction on this concept at the Hunting Park Pool.  D. Williams Dep. 37:20-41:11.  He said a WSI told them each lifeguard's zone of responsibility was "[b]asically the triangle zone from the corner of the pool to the edge of the pool."  Id. at 40:16-41:2.

[14] Baldwin testified that lifeguards knew their zones of responsibility because of where they sat, and he did not receive a pool diagram marking those zones.  Baldwin Dep. 33:2-35:22.

[15] The City recognizes three certifying agencies, though Kerwawich estimated that 95% of lifeguards are certified by the American Red Cross.  Kerwawich Dep. 82:5-18.

Red Cross and two years if it is from the American Heart
Association.  Id. at 95:20-96:15.

The Red Cross Manual also discusses in-service training
and annual training.[16]  The City's in-service training consisted
of the WSIs visiting the pools and conducting various types of

_____

[16] With respect to in-service training and annual
training, the Manual states that:

**In-service Training**

In-service training helps you keep your
knowledge and skills sharp.  The facility
manager, a head lifeguard, or someone in the
community, such as a public health official,
may conduct sessions. . . .  In-service
training sessions may address issues like
these:
▪ Potential hazards at the facility.
▪ Facility rules and regulations.
▪ Emergency action plans.
▪ Surveillance and water rescue skills.
▪ First aid, CPR, and head, neck, or back
injury and, when appropriate, bloodborne
pathogens, oxygen administration, and
automated external defibrillator (AED) skills
training.
▪ Physical conditioning.
▪ Decision-making.
▪ Internal staff issues such as
communication, teamwork, and morale.
***Lifeguarding Tip:*** *As a professional
lifeguard, you need to regularly participate
in in-service training sessions.*

**Annual Training**

You should have annual training, especially
if you work as a seasonal lifeguard.  Annual
training may include CPR review courses,
lifeguard training review courses, and review
of lifeguarding knowledge and skills. Talk to
your facility manager about annual training
opportunities.

Pls.' Resp. Ex. I Red Cross Manual at 5-6.

drills with the lifeguards.  Id. at 69:15-70:5, 73:10-74:1, 93:10-94:7.  In July of 2003, the City had about twenty-one WSIs and eighty-five pools, so the WSIs' drills were periodic, with some pools perhaps getting one drill a summer.  Id. at 70:6-71:18.  The City did not record when WSIs conducted drills, nor did it track when lifeguards received them.  Id. at 70:19-71:3, 73:2-9.  The City provided pre-season orientation for the lifeguards but did not mandate any further annual training, so a lifeguard might not receive extra training during the three-year period for which his or her certification was valid.  Id. at 96:16-97:13; Defs.' Prelim. Resp. 11.b, d.

Some of the lifeguards on duty on July 5, 2003 had received in-service training within a year of that date, while others had not.  Wright and Darrin Williams did not receive any in-service training during the summers of 2002 and 2003.  Wright Dep. 21:14-22:12; D. Williams Dep. 19:12-20:17, 30:6-31:13. Baldwin recalled at least one emergency rescue drill in the summer of 2002, and when he began working at the Hunting Park Pool in 2001 he received in-service training in the form of surprise skills tests perhaps as often as once a month.  Baldwin Dep. 20:6-22:1, 22:2-23:5.  WSIs twice visited Johnson's workplace at the City pool at 10th and Olney during the summer of 2002 and required the lifeguards to do performance drills. Johnson Dep. 16:15-17:3, 20:22-22:17.  Also, every day that summer Johnson had the lifeguards with whom he worked perform practice rescue drills.  Id. at 22:18-24:10.

12

C.   The Lifeguards on Duty

All of the lifeguards on duty at the Hunting Park Pool on July 5, 2003 had been trained and certified through the American Red Cross.  Kerwawich 82:19-83:1; Defs.' Prelim. Resp. 11.a.  All of them had rescued patrons before and none had been involved in a drowning at a City pool.  See Baldwin Dep. 72:1-73:8, 75:20-77:3; Johnson Dep. 83:1-85:3; D. Williams Dep. 102:18-103:14; Wright Dep. 72:17-74:13.

Marshall Johnson, II, a Lifeguard II and head lifeguard on July 5, 2003, was also a certified WSI.  Johnson Dep. 41:21-43:4.  He had worked for the City as a seasonal lifeguard for twenty-three years and had received his most recent lifeguard certification in April of 2002.  Id. at 8:20-9:13, 10:1-11:18.  In those twenty-three years, he performed many rescues, and none of the people he rescued required medical treatment.  Id. at 83:1-85:3.

Quiana Wright had been a lifeguard since 1999 and was re-certified by the American Red Cross on June 19, 2001.  Wright Dep. 5:12-6:5, 9:3-12; see also Defs.' Mot. Ex. L Lifeguard Test Report, June 19, 2001.  Lamont Baldwin became a lifeguard in 1980, and he worked for the City as a lifeguard almost every summer from 1980 through 2005.  Baldwin Dep. 8:14-17, 9:9-10:3.  On September 3, 2002, he received lifeguard and first aid certifications.  Id. at 10:18-23.  Darrin Williams received his first lifeguard certification in 1996 and worked at the Hunting Park Pool from 1996 through 2003.  D. Williams Dep. 9:13-24,

13

12:2-13:3.  He was re-certified as a lifeguard on June 15, 2002.
Id. at 10:1-12:1, 20:22-21:21.

John Williams, the facility supervisor on July 5, 2003,
had been a lifeguard for over thirty years.  J. Williams Dep.
11:11-12:3.  He was first certified around 1973 as a lifeguard
instructor -- i.e., one who instructs those seeking lifeguard
certification -- and around 1983 he was certified as a lifeguard
trainer -- one who teaches instructors how to teach aspiring
lifeguards.  Id. at 17:9-20:2.  In 1982, the City hired him as a
WSI to provide city-wide lifeguard training, and in July of 2003
he was still a certified lifeguard trainer.  Id. at 10:22-11:2,
17:9-12.

D.  Other Rescues

In the five years prior to Rashida's death, one person
died from drowning in a City pool.  This happened on August 22,
2001, when lifeguards found a young girl in the deep end of the
pool after her mother alerted them that the girl was missing.
Kerwawich Dep. 126:14-13; Defs.' Prelim. Resp. ¶ 7.  The
lifeguards on duty there had been drinking.  Baldwin Dep. 73:9-
75:11.  None of the lifeguards involved in the 2001 fatality were
working at the Hunting Park Pool on July 5, 2003.  Kerwawich Dep.
127:14-20.

In that same five-year period, the City identified five
other lifeguard rescues at City pools.  Id. at 128:11-137:18;
Defs.' Prelim. Resp. ¶ 8.a-b.; Pls.' Resp. Ex. V Report of
Occurrence (October 6, 1998 rescue of sixteen-year-old boy at

14

Marcus Foster Pool) & Incident Reports (reports for July 17, 2002 rescue of six-year-old girl at Belfield Pool; July 8, 2002 rescue of nine-year-old boy at Feltonville Pool; July 9, 2001 rescue of seven-year-old girl at Lincoln Pool; August 21, 2002 rescue of six-year-old boy at Vogt Pool).

E.   This Civil Action

On July 5, 2005, MaryEllen Daley, the administratrix pendente lite of Rashida's estate, and Rashida's mother Adjoa Garrett, on behalf of herself and her daughter's estate, filed in the Court of Common Pleas of Philadelphia County a lawsuit against the City of Philadelphia; the Philadelphia Department of Recreation[17]; Philip R. Goldsmith, then-Managing Director of the City; Victor N. Richard, III, then-Commissioner of the Department of Recreation; Quiana Wright; Darrin Williams[18]; Lamont Baldwin; Marshall Johnson, III; and John J. Williams.  On August 3, 2005, pursuant to 28 U.S.C. §§ 1441 and 1443, defendants removed the case to our Court because the complaint asserted two constitutional claims pursuant to 42 U.S.C. § 1983.  See 28 U.S.C. § 1331 ("The district courts shall have original

_____

[17] Defendants represent -- and plaintiffs do not dispute -- that pursuant to 53 P.S. § 16257, the Department of Recreation is not a separate legal entity against which suit can be maintained.  See Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mot.") 1 n.1.  We therefore consider all claims made against the Department of Recreation to be claims against the City.

[18] The complaint incorrectly gives Darrin Williams's name as Darwin Williams.

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The complaint states five claims: (1) negligence against the City and the Department of Recreation; (2) violation of due process rights, pursuant to 42 U.S.C. § 1983, against Wright, Baldwin, Johnson, Darrin Williams, and John Williams (the "Lifeguard defendants"); (3) violation of due process rights, pursuant to 42 U.S.C. § 1983, against the City, the Department of Recreation, Goldsmith, and Richard (the "City defendants"); (4) wrongful death against all defendants; and (5) a survival action against all defendants.  Before us now is defendants' motion for summary judgment, plaintiffs' response thereto, and defendants' reply.

II.  **Legal Analysis**[19]

---

[19] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986).  Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)).  The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52; Tabas v. Tabas, 47 F.3d 1280, 1287 (3d Cir. 1995) (en banc).

A.  The Section 1983 Claims

Plaintiff brings her two federal constitutional claims pursuant to 42 U.S.C. § 1983.[20]  Section 1983 does not itself create substantive rights, but it provides a remedy for people who have been deprived of rights conferred in the Constitution or federal statutes.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  To establish a Section 1983 claim, plaintiffs must show both that defendants deprived Rashida of a right secured by the Constitution or federal law, and that they did so while acting under color of state law.  See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997).  Plaintiffs allege that the City and the individual defendants violated Rashida's Fourteenth Amendment right to due process.  The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

---

[20] Section 1983 states, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

17

We turn first to the constitutional claim against the Lifeguard defendants and then the constitutional claim against the City defendants.  We review the Section 1983 claim against the City defendants independently of the claim against the Lifeguard defendants because the City defendants' liability does not depend upon the liability of any lifeguard.  See Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996); Fagan v. City of Vineland, 22 F.3d 1283, 1292-94 (3d Cir. 1994).

### 1.  The Lifeguard Defendants

To establish their due process claim against the Lifeguard defendants, plaintiffs rely solely on the "state-created danger theory."  Pls.' Resp. 15 ("[T]here is a genuine issue of material fact as to whether the individual lifeguards violated Rashida Fancher's constitutional rights under the state-created danger theory.").[21]  We therefore begin our analysis with the source of that theory, DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989).

In DeShaney, a Wisconsin family court awarded an abusive father custody of his young son, Joshua.  Id. at 191. Despite repeated complaints of abuse, the county's Department of

---

[21] We note the complaint states a claim for violation of "substantive and procedural due process."  Compl. ¶ 49. Plaintiffs, however, are now expressly proceeding against the Lifeguard defendants solely on a state-created danger theory, which, as discussed infra, arises from the substantive due process jurisprudence.  Since the parties have only identified an alleged material dispute of fact as to a substantive due process claim, the procedural due process claim against the lifeguards necessarily fails.

Social Services did not attempt to revoke custody, and the father ultimately beat Joshua so severely that he suffered permanent brain damage.  Id. at 192-93.  Joshua and his mother sued the county, department, and various employees under Section 1983 for depriving Joshua of his liberty without due process of law, in violation of his Fourteenth Amendment rights.

The Supreme Court held that a state or local governmental entity or its agents who fail to provide a person with adequate protective services do not violate the person's substantive due process rights.  Id. at 194.  The Court observed that:

> The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Id. at 195.

While "[a] State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes," the Fourteenth Amendment Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation."  Id. at 202.  Thus, this clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  Id. at 196.

19

After reciting this expansive language, the Court
recognized a limited exception: where a state has restrained a
person's liberty -- such as through incarceration or
institutionalization -- it may have "affirmative duties of care
and protection."  Id. at 198, 200.  This has come to be known as
the "special relationship" exception.  See Sanford v. Stiles, 456
F.3d 298, 304 n.4 (3d Cir. 2006) (per curiam).

More importantly for our purposes, the Court in
DeShaney commented that "[w]hile the State may have been aware of
the dangers that [the plaintiff] faced in the free world, it
played no part in their creation, nor did it do anything to
render him any more vulnerable to them."  489 U.S. at 201.  In
Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), a panel of our
Court of Appeals found that this statement "left open the
possibility that a constitutional violation might have occurred
despite the absence of a special relationship," id. at 1205.  It
therefore created a second exception to DeShaney's rule by
holding that a plaintiff can use a "state-created danger theory"
to establish a claim that state actors deprived her of the
Fourteenth Amendment right to substantive due process.  Id. at
1205, 1211.  This exception permits liability only "when the
State caused the harm or made the victim more vulnerable to an
existing harm."  Brown v. Pa. Dep't of Health Emergency Med.
Servs. Training Inst., 318 F.3d 473, 478 (3d Cir. 2003) (sur
panel rehearing).  Notably, as we discuss at greater length
infra, a later panel held in Brown that "there is no federal

20

constitutional right to rescue services, competent or otherwise."
Id. at 478.

To succeed on a state-created danger claim, a plaintiff
must prove four elements:

> (1) the harm ultimately caused was
> foreseeable and fairly direct;
> (2) a state actor acted with a degree of
> culpability that shocks the conscience;
> (3) a relationship between the state and the
> plaintiff existed such that the plaintiff was
> a foreseeable victim of the defendant's acts,
> or a member of a discrete class of persons
> subjected to the potential harm brought about
> by the state's actions, as opposed to a
> member of the public in general; and
> (4) a state actor affirmatively used his or
> her authority in a way that created a danger
> to the citizen or that rendered the citizen
> more vulnerable to danger than had the state
> not acted at all.

Sanford, 456 F.3d at 304-05 (quoting Bright v. Westmoreland
County, 443 F.3d 276, 281 (3d Cir.2006)).  Here, we begin by
addressing the second element -- the culpability standard -- and
because we find that plaintiffs cannot satisfy it, we need not
reach the arguments concerning the other elements.

State-created danger cases often turn on the
culpability standard because it is typically the most difficult
element for a plaintiff to prove.  Sanford, 456 F.3d at 305.
Sanford v. Stiles shed some light on our Court of Appeals's
complex jurisprudence concerning the culpability standard.  The
Court "again clarif[ied] that in any state-created danger case,
the state actor's behavior must always shock the conscience."
Id. at 310 (emphasis in original).  However, "what is required to
meet the conscience-shocking level will depend upon the

circumstances of each case, particularly the extent to which deliberation is possible." Id. at 310.  More concretely, "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." Id. at 309.  The court specified the type of state actor culpability a plaintiff must prove in each of three different situations: (1) in a "hyperpressurized environment," typically "an intent to cause harm" is required; (2) if a state actor has time to deliberate and make "unhurried judgments," he or she must have acted with "deliberate indifference"; and (3) when a state actor is not faced with a "hyperpressurized environment" but nevertheless cannot proceed in a deliberate manner (in other words, he or she must act "in a matter of hours or minutes"), the actor must have "consciously disregarded a great risk of harm." Id. at 309-10 (citation omitted).

        At issue here are the lifeguards' decisions in the few minutes immediately before and after Wright noticed Rashida floating in the pool.  Before deciding upon the relevant standard and applying it to the facts, we review the parties' arguments.

        Defendants contend that plaintiffs cannot show the lifeguards "consciously disregarded a great risk that serious harm would result."  Defs.' Reply Mem. in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") 7 (emphasis in original).  They point out that no one observed Rashida exhibiting any signs of distress at any time before the children found her floating semi-submerged in the pool's shallow end.  Once the lifeguards noticed

a problem, the only evidence is that they acted immediately and tried unsuccessfully to revive her.  Also, all of the lifeguards were certified and had made successful rescues in the past, and none had been involved with a drowning before.

Plaintiffs, in turn, assert there is "an abundance of evidence to support the determination that the individual lifeguards responsible for guarding Rashida's life acted in willful disregard for her safety."[22]  Pls.' Resp. 16.  They note Tahireh's testimony that, while the children were playing in the pool, she saw only one lifeguard in her chair and two talking by

---

[22] For the proposition that we must consider whether the state actor "acted in willful disregard for the safety of the plaintiff," plaintiffs rely on <u>Kneipp v. Tedder</u>, 95 F.3d at 1208-09.  Pls.' Resp. 15.  However, in light of the Supreme Court's decision in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998), our Court of Appeals refined its state-created danger test.  <u>See</u> <u>Schieber v. City of Philadelphia</u>, 320 F.3d 409, 416-21 (3d Cir. 2003) (summarizing how court had applied <u>Lewis</u>'s substantive due process standard).

In <u>Lewis</u>, the Supreme Court addressed a Section 1983 claim and held that a high-speed police chase with no intent to physically harm suspects or worsen their legal plight did not give rise to liability under the Fourteenth Amendment.  523 U.S. at 854.  In doing so, the Court addressed the long-standing "constitutional concept of conscience shocking" and reaffirmed that its decisions "rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  <u>Id.</u> at 848-49.

Post-<u>Lewis</u>, our Court of Appeals formulates the state-created danger standard as articulated in <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006), and repeated soon after in <u>Sanford</u>, 456 F.3d 298, 304-05 (3d Cir. 2006).  We therefore must consider whether the lifeguards "acted with a degree of culpability that shocks the conscience," evaluating their conduct based on the circumstances of this case.

the fence.[23]  Also, Wright responded only after the children
tried unsuccessfully to lift Rashida out of the water.  Finally,
plaintiffs' medical expert opined that CPR was not administered
until at least 4 1/2 to 5 minutes from the time Rashida was
submerged.

We turn now to Sanford's tiered culpability analysis.
Depending on how we interpret plaintiffs' arguments, we can apply
either the stringent "hyperpressurized environment" standard or
the intermediate standard that assumes the lifeguards had to act
"in a matter of hours or minutes."  Either application produces
the same result.

First, if we focus on the lifeguards' actions once
Wright noticed Rashida floating in the pool, they were
undoubtedly acting in a "hyperpressurized environment."  There is
ample undisputed evidence that, once alerted to the problem, the
lifeguards acted swiftly to rescue her from the pool, clear the
pool of other patrons, call 911, and administer CPR.  Even if
there is some disputed testimony as to precisely what they did

---

[23] Plaintiffs also submit as evidence an unsworn
statement made by a pool patron, Dennis Dyson.  See Pls.' Resp.
Ex. E.  Because unsworn statements fail to satisfy Fed. R. Civ.
P. 56(e)'s requirements, we shall not consider Dyson's statement.
See Adickes v. S. H. Kress & Co., 398 U.S. 144, 158 n.17 (1970)
(unsworn statement "does not meet the requirements of Fed. Rule
Civ. Proc. 56(e)"); see also Woloszyn v. County of Lawrence, 396
F.3d 314, 323 (3d Cir. 2005) (upholding district court's refusal
to consider unsworn statement in support of summary judgment
motion); Brown v. Thomas, No. 02-1669, 172 Fed. Appx. 446, 451,
2006 WL 825777, at *4 (3d Cir. Mar. 29, 2006) ("An unsworn
statement does not constitute the kind of competent evidence
necessary to create a genuine issue of material fact at summary
judgment.").

during their attempt to resuscitate her (i.e., whether they returned her to the water to clear the vomit from her airway), there is no record evidence that they gave anything other than their best efforts to help her.  Nor did they ever impede anyone else from providing her better care.  They did everything in their power to revive her until the paramedics arrived and took over.  In short, nothing on this record would support a finding that the lifeguards acted with "an intent to cause harm" to Rashida.

Next, if we liberally interpret plaintiffs' argument about the lifeguards' culpability, we might consider a slightly broader time frame -- the short time[24] leading up to Rashida's drowning when the lifeguards were observing patrons' behavior and directing it as necessary.  In that case, we apply the intermediate culpability standard and consider whether the lifeguards "consciously disregarded a great risk of harm."

To begin, with four lifeguards on duty and ninety-three patrons, the lifeguards were well below the maximum allowable 120 patrons.  Regardless of how the facility supervisor prioritized the factors he considered before closing half the pool, nothing on this record qualifies or undermines his testimony that he

---

[24] We shall never know how long it was between Rashida's first distress and her discovery.  Even the medical examiner's report says nothing about time, and it is unclear how Dr. Modell deduced "4 1/2 to 5 minutes" as the time "from onset of submersion until effective CPR was administered."  Dr. Modell's time span notably does not measure the time from "onset of submersion" until the first witness saw Rashida floating in the pool.

acted based on the needs and safety of the patrons.  Moreover, he did not violate any policy in opening only half of the fifty-yard-long pool.  Nor is there any evidence that the lifeguards ignored earlier signs of distress from Rashida.  Indeed, there is no evidence that anyone there observed her thrashing or struggling in the water.  Wright, near whose chair Rashida was found, was undisputedly in her chair and scanning the pool during the time before she saw Rashida floating.  As already discussed, Wright acted immediately when she detected a problem, as did the other lifeguards who cleared the pool, called 911, and tried to resuscitate Rashida.  Thus, even if the lifeguards identified Rashida's problem too late, nothing on the record suggests they "consciously disregarded" a great risk that she might suffer serious harm.  Whether the lifeguards may have been negligent is another question, but not a federal constitutional one: "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).  Plaintiff cannot satisfy the intermediate culpability standard.

In sum, the record fails to support a finding that the lifeguards' behavior shocked the conscience.  Because plaintiffs cannot prevail as a matter of law on the second element of the state-created danger test, they cannot establish that Rashida suffered a deprivation of her constitutional right to substantive due process.  Plaintiffs' Section 1983 claim against the lifeguards therefore must fail.

26

2.   <u>The City Defendants</u>

In <u>Monell v. New York City Department of Social
Services</u>, 436 U.S. 658, the Supreme Court held that "a
municipality cannot be held liable under § 1983 on a <u>respondeat
superior</u> theory," <u>id.</u> at 691, but it may be directly subject to
Section 1983 liability as a result of an official policy or
custom, <u>id.</u> at 694.  Thus, a Section 1983 plaintiff must identify
the municipal policy or custom that allegedly caused a violation
of her constitutional rights.  <u>See</u> <u>Bd. of County Comm'rs v.
Brown</u>, 520 U.S. 397, 403 (1997).

Plaintiffs here contend that the City violated
Rashida's Fourteenth Amendment rights by being deliberately
indifferent to inadequacies in lifeguard training that resulted
in her death.  Specifically, they assert that the City's failure
to sufficiently train their lifeguards resulted in the
lifeguards' inability to properly scan their zones of
responsibility.[25]  Plaintiffs focus primarily on the City's
failure to provide training beyond the certification classes --
except for random drills -- despite the recommendations in the

---

[25] Plaintiffs submit an expert report opining that had
the City regularly trained lifeguards on proper surveillance
techniques, there would not have been a "deadly delay in
observing Rashida's difficulty," and the lifeguards would have
applied lifesaving procedures sooner.  <u>See</u> Pls.' Resp. Ex. P Case
Report Prepared by Francis A. Cosgrove, MA, CPT, at p.7.
Defendants contend that plaintiffs' improperly use their expert
report for legal conclusions.  <u>See</u> Defs.' Reply 18-21.  Because,
as discussed below, our decision turns on the issue of
constitutional harm in the context of rescue services, we need
not resolve this dispute.

Red Cross Manual that lifeguards should participate in annual and in-service training. <u>See</u> Pls.' Resp. 18-24.

In <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989), the Supreme Court held that under certain circumstances a municipality can be liable under 42 U.S.C. § 1983 for constitutional violations resulting from its failure to train municipal employees, <u>id.</u> at 380. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." <u>Id.</u> at 389; <u>accord</u> <u>Fagan v. City of Vineland</u>, 22 F.3d 1283, 1292 (3d Cir. 1994) ("If it can be shown that the plaintiff suffered that injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights.").

As with any Section 1983 action alleging municipal liability, the first question in a failure-to-train case is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." <u>Canton</u>, 489 U.S. at 385. In all cases of municipality liability, a plaintiff must have suffered a violation of constitutional rights, <u>see</u> <u>Brown v. Pennsylvania Dept. of Health Emergency Med.</u> <u>Servs. Training Inst.</u>, 318 F.3d 473, 482 (3d Cir. 2003), and the

28

question of whether such a violation occurred is distinct from the question of municipal responsibility, see Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992).

In Brown, our Court of Appeals addressed whether the Due Process Clause requires states to provide adequate or competent rescue services when they have decided to undertake such services. 318 F.3d at 478. There, a woman called 911 when her nephew began choking on a grape, the 911 operator dispatched two emergency medical technicians ("EMTs"), and the operator assured the woman that help was coming. See id. at 475-76. It took the EMTs just over ten minutes to reach the boy. See id. at 476. During that interval, the aunt called 911 two more times asking for help, and both times the operator told her that help was on its way. See id. The EMTs tried to restore the boy's breathing during the trip to the hospital, but he died two days later due to "asphyxia by choking." Id.

The court rejected plaintiffs' Fourteenth Amendment due process claim against the City, wherein they had argued that with deliberate indifference the City enacted policies concerning EMTs that caused harm to them and their son. See id. at 482-83. The plaintiffs could not show "that the City's policies caused constitutional harm" because the City had "no constitutional obligation to provide competent rescue services." Id. at 483 (emphasis in original). The court expressly held that "states are not constitutionally obligated to provide rescue services,

29

nor are they constitutionally required to provide competent rescue services voluntarily undertaken." Id.

Plaintiffs contend that this case, unlike Brown, is not a rescue services case because Rashida was at a City-operated pool and not at home. See Pls.' Resp. 25. But nothing in Brown supports plaintiffs' narrow reading of that case. Nowhere did that court suggest that a municipality incurs a constitutional obligation to provide adequate rescue services on city-owned property where people are free to come and go as they please. Rashida chose to come to the pool, and she could enter and leave the water as she wished. To be sure, the City chose to provide rescue services through lifeguards at its pools, but Brown is clear that such a choice does not impose upon the City a constitutional obligation to ensure a particular level of competency of those services.

The City most assuredly was not "deliberately indifferent" to providing lifeguards at its swimming pools, as this record confirms at the Hunting Park Pool on that July day in 2003. Whether the City might have done a better job than it did as to Rashida's mysterious death is a question that, on this record, simply does not rise to federal constitutional dimension.

In the absence of an allegation of a constitutional harm, there can be no municipal liability under Section 1983. See id. at 483. Because the City did not have a constitutional obligation to provide always-effectual lifeguard rescue services at its pools, plaintiffs have failed to establish a

30

constitutional harm.  Accordingly, their Section 1983 claim
against the City defendants fails.

      B.  <u>Remanding the State Law Claims</u>

      Under the supplemental jurisdiction statute, "[t]he
district courts may decline to exercise supplemental jurisdiction
over a claim" if "the claim raises a novel or complex issue of
State law" or if "the district court has dismissed all claims
over which it has original jurisdiction."  <u>See</u> 28 U.S.C. §
1367(c)(1), (3).  Having resolved the only claims over which we
had original jurisdiction, all that remains are three state law
claims, at least one of which presents a complex issue of
Pennsylvania law.[26]  Any inconvenience the parties may incur in
returning to state court will be minor since they can use the
same information they have already developed during discovery
here.  Rather than undertaking the perilous endeavor of

---

      [26] Defendants contend that plaintiffs' negligence claim
against the City is barred by Pennsylvania's Political
Subdivision Tort Claims Act (the "Act"), which immunizes
municipalities and their employees from state law claims, except
in eight types of cases.  <u>See</u> 42 Pa.C.S. §§ 8541-42.  Plaintiffs
assert that the negligence claim falls under the Act's real
property exception, which allows claims arising from the "care,
custody or control of real property in the possession of the
local agency."  42 Pa.C.S. § 8542(b)(3).  Plaintiffs argue that
the lifeguards were negligent in their care and control of the
pool because they closed off part of the pool -- due to lack of
lifeguards, glass and rocks in the closed area, as well as broken
chairs -- thereby creating a dangerous crowding condition that
caused Rashida's death.  Neither party has identified a
Pennsylvania state court case holding whether the Act's real
property exception applies to a drowning (or any kind of
accident) at a City-controlled pool on facts similar to those
before us.  Thus, any <u>Erie</u>-mandated prediction of Pennsylvania
law we might make would be nothing more than a guess.

predicting how a Pennsylvania court would interpret its statutes on these unusual facts, we shall remand this case to allow the Pennsylvania courts to decide the claims arising under the Commonwealth's law.

## III.   <u>Conclusion</u>

For the reasons discussed herein, as a matter of law plaintiffs cannot establish that defendants violated Rashida's Fourteenth Amendment right to due process.  Having resolved the only claims over which we have original jurisdiction, we shall remand to state court the remaining claims based on questions of Pennsylvania law.  An appropriate Order and Judgment follow.


BY THE COURT:


/s/ Stewart Dalzell, J.